IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-876-F

| | | |
|---|---|---|
| ORDEAN WATSON ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SOUTHERN BANK AND TRUST COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion for Summary Judgment [DE-21] filed by Defendant Southern Bank and Trust Company ("Southern"). Plaintiff Ordean Watson Robinson ("Robinson") has responded, and Southern has replied. For the reasons stated below, Southern's Motion for Summary Judgment [DE-21] is ALLOWED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Robinson, initially proceeding *pro se*, initiated this action claiming Southern violated Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. Section 1981 ("§ 1981"), and 42 U.S.C. Section 1983, by discriminating against her because of her race, African American. *See* Compl. [DE-4]. Specifically, Robinson alleged that Southern discriminated against her when it failed to rehire her after she voluntarily retired from employment. Robinson is now represented by counsel.

### A. Southern Bank & Trust Company

Southern is a regional bank headquartered in Mount Olive, North Carolina, with branch offices throughout Eastern North Carolina and Hampton Roads Virginia. *See* Declaration of

Valerie Roberson ("Roberson Decl.") [DE-21-3]¶ 3. At the time of her retirement, Plaintiff worked as an escrow specialist in Southern's affiliated mortgage services division ("mortgage division"). *Id.* ¶¶ 4, 6. The mortgage division offices are located at 230 Sunset Avenue, Rocky Mount, North Carolina. *Id.* ¶ 4. The mortgage division is separate and apart from Southern's four Rocky Mount branch offices: Westridge, Oakwood, Franklin Street, and Benvenue. *Id.*

### B. Robinson's Employment, Retirement, and Attempts to be Rehired

Southern, or its predecessor, employed Robinson for twenty-six (26) years prior to her voluntary retirement in January 2012. Robinson Dep. [DE-21-1] at 44. Robinson worked as a customer service checking representative for roughly one year, a management accountant for seven years, and for approximately eighteen years, Robinson held the position of escrow specialist. *Id.* at 32-33. In the escrow specialist role, Robinson paid the escrow insurance portion of the mortgages serviced by the bank. *Id.* at 32.

By letter dated September 9, 2011, Robinson submitted notice of her intent to retire effective January 31, 2012. *Id.* at 44; Roberson Decl. Attachment A [DE-21-3]. Robinson decided to retire because she found her work overwhelming. She found herself working late at night and on the weekends; she also asked for help but did not receive any from her co-workers. Robinson Dep. [DE-25-2] at 46. Prior to tendering her notice of retirement, Robinson asked Brian Joyner[5] whether, instead of retiring, she would work part-time as an escrow specialist after Joyner hired a replacement for her full-time position, but was told that was not an option in that position. *Id.* at 47; Declaration of Ordean Robinson ("Robinson Decl.") [DE-25-1] ¶ 2.[6]

---

[5] It is not apparent from the briefing what position Brian Joyner occupied at Southern.
[6] Robinson's statement in her declaration regarding her inquiry into the availability of part-time work appears to conflict with her deposition testimony. Specifically, she was asked in her deposition why she didn't just say "I want to leave my full-time position and go into a part-time position?" to which she answered: "Well, because I just decided to go ahead and retire from Southern Bank." Robinson Dep. [DE-

2

Robinson trained one of her replacements, a Caucasion woman, before she retired. Robinson Dep. [DE-21-1] at 32.

Shortly after Robinson retired, she started drawing pension payments, which she continues to receive monthly. *Id.* at 48-49. A few months into her retirement, Robinson began working three days a week providing dispatch-type support for a friend's landscaping company. *Id.* at 49-51. The temporary position lasted from April through June of 2012. *Id.* at 49. After leaving the landscaping company, Robinson did not seek regular employment again until roughly nine-months later. *Id.* at 51.

On or about March or April 2013, Robinson visited Southern's Rocky Mount-Franklin Street branch ("Franklin Street") office to conduct personal banking business. *Id.* at 56. While Robinson was at the Franklin Street office, Gloria Williams, a customer service representative at that branch and a friend of Robinson's, told Robinson about a part-time "loan officer assistant" vacancy at the Rocky Mount-Benvenue branch ("Benvenue"). *Id.* at 56, 59. The Benvenue office is near Robinson's home. *Id.* at 56. Williams telephoned Regional Administrative Assistant Marci Credle in Robinson's presence and told Credle that Robinson used to work for Southern and wanted to speak with her about the "loan officer position."[7] *Id.* at 61. Williams then handed the phone to Robinson who stated that she was interested in applying for the position at the Benvenue branch. *Id.* According to Robinson, Credle responded "oh great . . . . let me get your number and I will find out what we need to do and I'll give you a call back." *Id* at 61. A little more than a week later, Credle called Robinson and informed her that Southern does not rehire retirees because of the effect on pension payments. *Id.* at 62, 75. Robinson thought what Credle said was strange, because she was aware of Southern retirees who had been rehired, but she did

---

25-2] at 47. She only testified about talking to a Southern employee about part-time employment *after* she retired. *Id.* at 47-48.

3

not ask Credle questions because she just assumed that Southern had changed its policy regarding retiree rehiring. *Id.* at 62.

According to Southern, there was no opening for a loan officer assistant position. Declaration of Bryan Huff ("Huff Decl.") [DE-21-4] ¶ 3; Roberson Decl. [DE-21-3] ¶ 12. Rather, there was a part-time teller vacancy at the Benvenue branch. Robinson explains that she and Williams labeled the position "Loan Officer Assistant" is because she and Williams were aware that Vicki Crone had vacated the position of Loan Officer Assistant/Teller at that branch. In any event, the part-time teller position was filled by a Caucasian internal candidate, Brenda Adkins. According to Southern, its policy is to give hiring preference to internal candidates who apply for vacant positions. Second Decl. of Roberson [DE-26-1] ¶ 3.

On or about May 2013, Robinson called Southern's Mount Olive branch to speak with an employee named Susie Holmes who had assisted Plaintiff previously. Robinson Dep. [DE-21-1] at 67. The receptionist informed Robinson that Holmes, a Caucasian, had retired in April, but would come back to work in June. *Id.* The receptionist transferred Robinson to a woman named Lisa Ferrell who told Robinson that Southern's rule is that an employee must be retired for thirty (30) days prior to returning to work. *Id.* The record reflects that Ferrell is an Operations Clerk, and in that role she possesses no supervisory authority and is not involved in the development of Bank policies. Roberson Decl. [DE-21-3] ¶ 11.

On June 3, 2013, Robinson emailed Credle, copying Senior Vice President and Human Resources Manager Valerie Roberson. Robinson Dep. [DE-21-1] at 80, Ex. 3 [DE-21-2]. In the email, Robinson stated:

> Hi,
> This email is in response to my request for rehire with Southern Bank. Thank you for your reply. I can't remember exactly what you said but I know it was basically that the Human Resource of Southern Bank is not interested in the rehire of

4

retirees because of the effect on pension payments. I did not submit a resume or do an application. However, I want to express my interest in part-time employment if Southern Bank should change its position on rehiring retirees. I enjoyed my 26 years of employment with . . . Southern Bank.

*Id.* On June 6, 2013, Credle responded thanking Robinson and indicating that Southern would remember Robinson "[s]hould the position change on rehiring retirees." *Id.*

On June 10, 2013, Robinson sent a follow up email to Roberson asking whether her election to receive her pension early had made a difference in Southern's position on rehire, and whether the pension benefits could be stopped. Robinson Dep. [DE-21-1] at 80, Ex. 4 [DE-21-2]. Roberson responded stating, in part:

> Ordean, we appreciate your interest in potential re-employment on a part-time basis. However the Bank has not changed its practice on this topic of rehiring retirees and I don't foresee it will in the future. In reference to your question on stopping your pension payment – no, once you start this payment you cannot change it. One of the main reasons executive management made the decision to typically not re-hire retirees is that doing so may actually allowing [sic] the rehired retiree to "double dip" when it comes to the pension plan. This could put our pension plan at risk and involves unnecessary administrative work and expense.

Robinson Dep. [DE-21-1] at 84; Ex. 5 [DE-21-2]. Robinson did not send any further correspondence regarding rehire. Robinson Dep. [DE-21-1] at 85-86.

### C. Other retirees who have been rehired

Southern maintains that it is its normal practice that former employees who retire, and obtain pension benefits, are not eligible for rehire. Decl. Roberson [DE-21-3] ¶ 15. Nevertheless, it states that the practice "has been modified to fit unique individual circumstances on rare occasions." *Id.* Specifically, Southern has rehired four retirees, although only three of those individuals still work for the bank. Southern maintains that these exceptions have been made "because the Bank critically needed their particular skills due to numerous organizational

5

changes, a merger and operating system conversions." *Id.* Specifically, Southern provides the following details regarding the individuals still working at the Bank:

> The Bank asked Ms. Joyce Wall, whose job title prior to her retirement was Loan System Expert, to return to work in early 2013 because her skill set was needed. Ms. Wall had significant experience with AFS and "Pay AnyDay" loan systems. Ms. Wall understood loan policy and procedures and loan operations work flow and did not require training in this area. Ms. Wall works at the Mount Olive, North Carolina branch.
>
> Ms. Susie Holmes, a Deposit Operations Supervisor, gave notice of her intent to retire in early 2013. Bank management asked her to return to work on a part-time basis because of the core operating system conversion process underway. Deposit Operations was understaffed and the Bank could not afford to lose her. Ms. Holmes had significant knowledge of the Bank's legacy operating systems, such as the Hogan computer operating system which held all of the Bank's deposit accounts, some lines of credit, equity lines and customer-specific information. Ms. Holmes works at the Mount Olive, North Carolina branch.
>
> In 2011. Lamuriel Swinson. Deposit Operations Manager, experienced difficulty working full-time due to family medical issues. Ms. Swinson asked to retire and work part-time. The Bank agreed to the exception because her skills and expertise were needed. Ms. Swinson is perhaps is more knowledgeable about the Bank's core operating system than any other employee. Ms. Swinson continues to perform clean-up work from the core conversion and continues to handle deposit-related items associated with the core conversion as a part-time Operations Support Administrator. Ms. Swinson works at the Mount Olive, North Carolina branch.

Decl. Roberson [DE-21-3] ¶15A-C. The parties appear to agree that these employees were all Caucasian. With regard the retiree who was temporarily rehired, Southern explains:

> Pat Lane (Caucasian) was rehired temporarily as a Marketing Administrative Assistant in 2012. At the time the exception was made for Ms. Lane's rehire, the Bank had decided to build an intranet site for the core conversion to answer employee questions about the process. The timeline for the creation of the site was compressed and Ms. Lane knew the Bank's intranet site architecture and design so that she could be relied on to efficiently create the intranet site for the conversion. Ms. Lane's return was temporary. She is no longer with the Company.

Second Decl. Roberson [DE-26-1] ¶ 6. Additionally, two members of Southern's General Board of Directors are former Presidents and Chief Executive Officers of the Bank. *Id.* at ¶¶ 7-8.

6

## II.     STANDARD OF REVIEW

At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matsushita*, 475 U.S. at 587; *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be viewed in the light most favorable to the nonmoving party and all reasonable inferences should be made in favor of the nonmoving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996).

7

Case 5:13-cv-00876-F   Document 27   Filed 04/09/15   Page 7 of 13

## III. ANALYSIS

### A. Applicable Law

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(l). Similarly, Title 42, United States Code Section 1981 "outlaws race discrimination in the making and enforcement of private contracts." *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). Under either Title VII or Section 1981, a plaintiff may establish a claim for intentional discrimination via two avenues of proof: (1) the burden-shifting pretext method, as espoused in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), or (2) the mixed motive method. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.* 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc); *see also Mallory v. Booth Refrigeration Supply Co., Inc.*, 882 F.2d 908, 910 (4th Cir. 1989) ("[T]he framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII, or § 1981, or both statutes."). In this case, there is no indication that Robinson is pursuing the mixed-motive method, so the court will utilize the *McDonell Douglas* scheme.

Under the familiar *McDonnell Douglas* scheme, a plaintiff first must establish a *prima facie* case of discrimination. *See id.*, 411 U.S. at 802. To establish a *prima facie* case of discriminatory failure to hire, a plaintiff must proffer evidence showing that (1) she is a member of a protected class; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference

8

of unlawful discrimination. *Id*; *Bryant v. Aiken Regional Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to defendant to produce a legitimate, nondiscriminatory reason for its decision. *See Bryant*, 333 F.3d at 545. If the defendant meets it burden of production by setting forth a legitimate, nondiscriminatory reason for its decision, the plaintiff then bears the burden of showing, by a preponderance of the evidence, that the defendant's proffered neutral reasons were not its true reasons, but were instead a pretext for discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). "[T]he burden to demonstrate pretext has merged with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quotation omitted).

## B. The parties' contentions

In this case, Southern contends that Robinson cannot establish a *prima facie* case of discrimination because she did not apply for an open position at the Bank for which she was qualified, and she was not rejected for any position under circumstances that give rise to an inference of discrimination. Southern further contends that even if this court assumes that Robinson has established a *prima facie* case, she has not met her burden in showing that Southern's legitimate, non-discriminatory reason for not hiring her is a pretext for race discrimination. In response, Robinson contends that she attempted to apply for a part-time vacant position at the Bank—no matter what its title—and was qualified for the position. She also contends that she has created an issue of fact as to pretext because she has presented evidence

showing that the proffered reason for not hiring was a "recent fabrication." She also contends that she has proffered evidence of a "corporate culture" of discrimination at Southern.

C.  **Assuming that Robinson has established a *prima facie* case, she has failed to proffer sufficient evidence of pretext.**

The court will assume, for purposes of this motion, that Robinson has proffered sufficient evidence to establish a prima facie case of race discrimination. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319 (4th Cir. 2005) (assuming for purposes of appeal that plaintiff established prima facie case of race discrimination). Even if this court assumes that she has proffered sufficient evidence to establish a prima facie case of discrimination, however, the court finds that Southern has met its burden of production by proffering a legitimate, non-discriminatory reason for not hiring Robinson: it typically does not rehire retirees who are receiving pension payments because of the administrative difficulties associated with recalculating those payments. The court also finds that Robinson has failed to proffer sufficient evidence which would allow a reasonable jury to conclude that Southern's proffered reason for not hiring her is a mere pretext for race discrimination.

Specifically, Robinson proffers four main attacks on Southern's reason for not hiring her: (1) Southern's explanation is a recent fabrication; (2) other Caucasian retirees have been rehired; (3) African American employees are not given the same opportunities for promotions and advancements as non-African American employees at Southern; and (4) the Bank has a culture of discrimination. None of these arguments are sufficient to create a jury question on the issue of disability discrimination.

Her first argument—that Southern's explanation is a recent fabrication—lacks support in the record. Robinson argues that the first Southern employee to which she expressed her interest

10

in coming back to work part-time, Credle, should have known about Southern's hiring policies and should have immediately told her about Southern's policy regarding not rehiring retirees. Robinson contends that the fact that Credle did not do so is evidence that the policy was a fabricated pretext not to hire her. The record shows, however, that despite Robinson's belief that Credle "was in charge of hiring," she is an administrative assistant who performs administrative duties related to regional management, and does not possess any supervisory or ultimate hiring authority. Decl. Roberson [DE-21-3] ¶ 9. The record also reflects that Credle contacted Roberson, who was then Vice President and Manager of Human Resources for the Bank, after Robinson expressed interest in a part-time position. *Id.* ¶¶ 2, 8. Roberson, who at the time had no knowledge of Robinson's race, told Credle about Southern's policy about generally not rehiring retirees. *Id.* ¶ 8, Second. Decl. Roberson [DE-26-1] ¶ 9. There is nothing in the record, other than Robinson's own speculation, that Southern fabricated the policy in response to inquiry about a part-time position. Even if the court could agree with Robinson that there were "inconsistencies" in what was communicated to her about the policy, the record is devoid of racial animus—Roberson did not know Robinson's race. *See Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004) ("It is not enough to disbelieve the defendants here; the fact-finder must believe [the plaintiff's] explanation of intentional race discrimination.").

Nor does the fact that Southern has hired Caucasian retirees provide sufficient evidence of pretext. Southern has shown that when it has rehired retirees, it has done so because it has critically needed those individual's particular skills. *See* Decl. Roberson [DE-21-3] ¶ 15; Second Decl. Roberson [DE-26-1] ¶ 6. Robinson has not proffered any evidence which casts doubt on this explanation. *Cf. Thompson v. Connecticut State Univ.*, 466 F. Supp. 2d 444, 453 (D. Conn. 2006) (finding that plaintiff retiree did not rebut defendant's legitimate business reason for not

11

offering her part-time employment at the end of her sabbatical where other retirees who were rehired were asked to return in order to complete specific projects that were already underway). Nor can Robinson credibly compare her situation with the fact that two former Southern executives serve on the company's Board of Directors.

Robinson's third and fourth arguments—that African-Americans are not afforded the same opportunities for advancement and that the Southern has a culture of discrimination—are not supported by evidence. As to the third argument, Robinson contends that her friend, Gloria Williams, has assisted in training three non-African American employees to be managers above her, while Williams has remained in a customer service representative position. Decl. Robinson [DE-25-1] ¶10. This experience of Williams, taken in the abstract, is not sufficient to show pretext in the absence of evidence that Williams applied for any of these manager positions or evidence showing Williams' qualifications (other than years of experience) as compared to these managers. Without such contextual evidence, Robinson's belief as to Williams' experience does not show Williams—or any other African-American—was denied the same opportunities for advancement as non-African Americans.

As to Robinson's assertions that Southern has a culture of discrimination, all she has proffered, at bottom, is her speculation. She relies on the fact that four Southern branches in her immediate area do not currently have any African-American employees. The court agrees with Southern that these facts, taken in the abstract and without any evidence that other qualified African Americans were rejected for employment at those branches, are irrelevant. As the Tenth Circuit has explained:

> "It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer

discriminated against individual members of the class." *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991). On the other hand, "[s]tatistics taken in isolation are generally not probative of . . . discrimination," *Jones v. Unisys Corp.,* 54 F.3d 624, 632 (10th Cir.1995), and statistical evidence on its own "will rarely suffice" to show pretext, *Ortiz v. Norton,* 254 F.3d 889, 897 (10th Cir.2001). At the very least, in order to create an inference of pretext, "a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Fallis,* 944 F.2d at 746.

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1114-15 (10th Cir. 2007). Indeed, the Fourth Circuit has recognized that although statistical evidence is relevant in a Title VII case, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994). Here, there is no evidence of the surrounding facts and circumstances which would make Robinson's proffer that four branches do not employ African-Americans useful.

In sum, Robinson has failed to proffer evidence showing that Southern's stated reason for not hiring her was a pretext for discrimination. Without such evidence, a jury could not find that Southern's decision was unlawful race discrimination. Accordingly, Southern's Motion for Summary Judgment [DE-21] is ALLOWED.

## IV. CONCLUSION

For the foregoing reasons, Southern's Motion for Summary Judgment [DE-21] is ALLOWED. The Clerk of Court is DIRECTED to close this case and remove this matter from the court's trial calendar.

SO ORDERED.

This the 9ᵗʰ day of April, 2015.

James C. Fox
Senior United States District Judge